UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROOSEVELT RUPERT,

                    Petitioner,                    Case No.12-10320

v.                                       HON. AVERN COHN

PAUL KLEE,

                    Respondent.
_____/

**MEMORANDUM AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**

I.  Introduction

This is a habeas case under 28 U.S.C. § 2254.  Roosevelt Rupert, ("Petitioner"), was convicted by a jury in state court of first-degree murder, M.C.L. § 750.316, and commission of a felony with a firearm, M.C.L. § 750.227b.  Petitioner is serving a mandatory life sentence for the murder and a consecutive two years for the firearm offense.  The petition raises five claims: 1) prosecutorial misconduct, 2) violation of right to present a defense and confront witnesses, 3) violation of right to public trial, 4) additional prosecutorial misconduct, 5) ineffective assistance of counsel.[1]  For the reasons that follow, the petition will be denied.

II.  Background

A.  Factual Background

_____

[1]The petition list two additional claims.  However these claims consist of further arguments in support of Petitioner's third, fourth, and fifth claims and will be addressed <u>infra</u> where appropriate.

The Court recites verbatim the relevant facts relied upon by the Michigan Court

of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. §

2254(e)(1). See Wagner v. Smith, 581 F.3d 410, 413 (6th Cir. 2009):

This case arose out of the May 31, 2008, shooting death of John
Young. The shooting took place in front of a house located at 11521
Whitehorn Street in Romulus, Michigan. After receiving a dispatch at
10:38 p.m., Sergeant Derran Shelby arrived at the scene and found Young
slumped in a lawn chair on the driveway. Young's right temple was
wounded, and he appeared deceased. A medical examiner later
determined that Young died from a single, contact gunshot wound to the
right eyebrow. The bullet was recovered and determined to be medium
caliber, either a .38, .357, 9 mm, 10 mm, or .40. No weapon was
recovered.

After discovering Young's body, Sergeant Shelby attempted to
ascertain what had happened. He spoke to Greenberry Griffin, who
appeared to be in a state of disbelief. Griffin told the sergeant that his
nephew, defendant, shot Young. Detective Joshua Monte also interviewed
Griffin at the scene of the shooting. Griffin said the shooter was Roosevelt
Holiday. The detective testified that from "prior contacts with, um,
Roosevelt at the Romulus Police Department, we also know him as
Roosevelt Rupert" [defendant]. Out of six photographs, Griffin identified
defendant as the shooter.

Griffin testified that his mother, defendant's great aunt, lived at
11521 Whitehorn Street, and that he lived in the house next door. Griffin
had known Young for approximately ten years, had a brotherly relationship
with him, and saw him four or five times a week. Young had loaned him
approximately $1000 to prevent Griffin's mother's house from being
foreclosed. On the day of the shooting, Young came to see him twice. The
first time, Griffin paid him $300. The second time, Griffin and Young sat
down in lawn chairs on the driveway of Griffin's mother's house.

While they were sitting on the driveway, defendant drove up and
parked a white Taurus across the street. Roosevelt Holiday, defendant's
father and a paraplegic, was in the car and remained there. Defendant
exited the car, approached the two men, and asked about his great aunt.
When Griffin said that she was inside the house cooking, defendant went
inside and came back out sometime later with a plate of food. Griffin
believed that defendant gave the plate to his father. A few minutes later,
defendant approached the two men again, holding a marijuana joint or
blunt. Defendant asked Young if he wanted to "hit this joint." Young said

2

"no," explaining that he did not drink or smoke because he was diabetic. Defendant said "okay" and then shot Young in the head. Griffin said, "Why?" Defendant then walked away, without saying anything. Griffin subsequently asked a neighbor to telephone the police about the shooting.

At trial, Griffin admitted purchasing crack cocaine from Young. He guessed that Young also sold marijuana. Griffin testified he last used crack cocaine approximately two weeks before the shooting. He and Young had some "fallouts" because Young wanted Griffin to stop using, although Young never cut off his supply. Young had also been upset with Griffin in the past because Griffin owed him money. Griffin initially denied that Young ever threatened him, but eventually admitted that Young always said he was going to beat Griffin up.

Griffin's mother, Dicey Seaberry, testified that on the day of the shooting, she gave defendant a plate of food, whichhe took outside to his father. Defendant returned to the house and he ate. After eating, defendant left the house. "About five or six seconds or maybe minutes" later, Seaberry heard a sound like a balloon bursting or a firecracker. Five to ten minutes later, Griffin came into the house and said that defendant shot Young.

Maurice Wilkins had known defendant for approximately 20 years. On the day of the shooting, Wilkins went to the home of defendant's uncle, Terry Holiday, who lived on Whitehorn Street across from Seaberry. Terry and several other people were seated in a car on Terry's driveway, facing the street. Wilkins stood next to the car. At some point, he heard a single gunshot from across the street. He then saw defendant walk across the street toward them, get into a white car, and drive away. Everyone scattered.
The next day, Wilkins identified defendant as the person he saw crossing the street out of six photographs shown to him by police.

In the early morning hours of June 1, 2008, police searched an apartment in Belleville, Michigan. Defendant's father was in the apartment. He appeared highly medicated and did not provide coherent answers to any of the officers' questions. In one of the bedrooms, the police found mail addressed to defendant, male clothing, and bullets of numerous calibers. No weapons were found. Several officers testified that in August 2003, they participated in a search of the house at 11521 Whitehorn Street. At the time, it was the residence of defendant's father and his father's brother Darrell Holiday. The police found marijuana plants in the backyard and several guns. Defendant's father gave the police a .38 revolver, which was returned to him in September 2003. The revolver had not been reported stolen or lost since that time.

3

At approximately 3:00 a.m. on June 1, 2008, defendant came to the police station with his mother and presented himself to the police. He was taken into custody and  interviewed. Griffin had informed the police that defendant was wearing a white t-shirt and beige baggy "short pants" at the time of the shooting. A photograph taken at a gas station at 10:10 p.m. on May 31 depicted defendant wearing a white t-shirt and baggy blue jeans. When defendant arrived at the police station, he was not wearing clothing matching either description. Defendant denied changing clothes, denied being at his great aunt's house on May 31, and stated that "he didn't realize anything had happened over there."

At trial, three witnesses testified on defendant's behalf. Defendant's mother, Pamela Stanton, testified that in 2003, defendant lived with her, not his father. Defendant assisted in caring for his father. She volunteered that defendant was in jail in 2004. Anthony Tucker testified that he is a cousin of both Griffin and defendant, and that he had seen 9 mm bullets in Griffin's house on different occasions. Young's daughter, Ayisha Brandon, testified that Griffin called her on Young's cell phone at approximately 3:45 a.m. on June 1. Griffin told her that "Holiday-slash-Rupert" killed Young. Later, Griffin told her that Trey Holiday's son, who she identified as defendant, killed Young. Brandon further testified that the day before the shooting, she saw Young give a pistol to Griffin. Young told her that he gave the pistol to Griffin because he did not want to drive with it in his car. Griffin had registered guns for Young in the past and owed him a lot of money. Brandon testified that she did not know how much money Griffin owed Young, but she told the police
Griffin paid Young approximately $900 a month.

People v. Rupert, No. 290545, 2010 WL 2076983, *1-3 (Mich. Ct. App. May 25, 2010).

## B. Direct Appeal Proceedings

Petitioner filed a direct appeal, presenting Petitioner's first two habeas claims.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished

opinion. Id.  Petitioner filed an application for leave to appeal in the Michigan Supreme

Court, raising these two claims together with two additional claims. The application was

denied by standard order on October 26, 2010. People v. Rupert, 789 N.W.2d 454

(Mich. 2010) (unpublished table decision).  Petitioner did not file a petition for a writ of

certiorari.

4

## C.  Habeas Proceedings Following Direct Appeal

With only a few days remaining on the one-year statute of limitations, Petitioner filed this action on January 19, 2012, raising what now form his first two claims.  (Doc. 1.)  On February 14, 2012, Petitioner filed a motion for stay, asserting that he had filed for post-conviction review in the trial court or wished to return to the state courts to do so.  (Doc. 6).  The Court granted the motion and stayed the case.  The Court also noted that it was unclear whether any time remained on the statute of limitations.  (Doc. 7 at 4).

## D.  Collateral Review Proceedings

Petitioner filed a motion for relief from judgment in the trial court on July 17, 2012, raising what now form his remaining claims.  The trial court denied the motion for relief from judgment on September 27, 2012.  Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals. The Michigan Court of Appeals denied the application for leave to appeal "for lack of merit for the reasons articulated in the trial court's opinion." People v. Rupert, No. 314931 (Mich. Ct. App. Nov. 4, 2013). Petitioner sought leave to appeal this decision in the Michigan Supreme Court, but his application was denied under Michigan Court Rule 6.508(D). People v. Rupert, 847 N.W.2d 620 (Mich. 2014). (unpublished table decision).

## D.  Habeas Proceedings Following Collateral Review

Following the denial of relief in state court, Petitioner moved to lift the stay in this case.  The Court granted the motion.  (Doc. 11).  The parties filed supplemental papers. See Docs. 11, 14, 17.  The matter is now ready for decision.

II.  Standard of Review

28 U.S.C. section 2254(d)(1) curtails a federal court's review of constitutional claims raised by a state prisoner in a habeas action if the claims were adjudicated on the merits by the state courts. Relief is bared under this section unless the state court adjudication was "contrary to" or resulted in an "unreasonable application of" clearly established Supreme Court law.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam), quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

"[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) quoting Williams, 529 U.S. at 413.

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S.86, 101 (2011), quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining

6

habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103 (internal quotation omitted).

### III.  Analysis

#### A.  Claims 1 and 5 - Prosecutorial Misconduct/Ineffective Assistance of Counsel

Petitioner asserts multiple instances of prosecutorial misconduct claims and that his counsel was ineffective for failing to object to any of the unpreserved allegations of misconduct.

To be entitled to habeas relief on a prosecutorial misconduct claim, the petitioner must show that the prosecutor's conduct so infected the trial as to render the conviction fundamentally unfair. Parker v. Matthews, 132 S. Ct. 2148, 2153 (2012); Darden v. Wainwright, 477 U.S. 168 (1986); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Counsel is not ineffective for failing to object meritless claims of prosecutorial misconduct. Fuller v. Lafler, 826 F. Supp. 2d 1040, 1060 ( E.D. Mich. 2011).

Here, the Michigan Court of Appeals recited the correct constitutional standard, and then it rejected each of Petitioner's allegations of misconduct by applying that standard in light of the record evidence.  Given the deferential standard of review afforded state court decision under section 2254(d), the particular allegations of misconduct will be discussed briefly to support the conclusion that a fairminded jurist could reject them.

7

1.  Stipulation Regarding Forensic Evidence

While putting a stipulation on the record, the prosecutor referred to stains found in Petitioner's vehicle that did not contain blood as "minute" ones.  Trial counsel objected.  The trial court corrected any error by deleting the word and thus removing any suggestion that if the stains had been larger, blood might have been detected.  A fairminded jurist could find that this brief exchange quickly and effectively corrected by the trial court did not render the trial fundamentally unfair.

2.  Griffin's Prior Identification of Petitioner as Shooter

During direct examination of Griffin, the prosecutor elicited testimony that he identified Petitioner as the shooter at the police station, during an investigative subpoena hearing, and at the preliminary examination.  The Michigan Court of Appeals correctly noted that prior identification testimony is admissible on direct examination. See MRE 801(d)(1)(C).  This decision is reasonable.  The evidence was properly admitted under state law and therefore cannot form the basis for a claim of prosecutorial misconduct.

3. Evidence Petitioner had Prior Contact with Police

Detective Monte testified that when Griffin identified Roosevelt Holiday as the shooter, he knew this referred to Roosevelt Rupert because of Petitioner's prior contacts with his police department.  Trial counsel objected.  The trial court instructed the jury to disregard any testimony about Petitioner's prior contacts with the police.  A fairminded jurist could find that this volunteered, minimally prejudicial comment–which the trial court instructed the jury to disregard–did not render Petitioner's trial fundamentally unfair.

4.  Evidence Petitioner was Paid for Caring for his Father and Petitioner's Prior
Conviction

Petitioner's mother testified on direct examination by the prosecutor that

Petitioner was paid to care for his father by the State, and that he served time in jail for

home invasion.  The Michigan Court of Appeals found that it was improper for the

prosecutor to elicit this testimony, but that any error was harmless in light of the

substantial evidence of Petitioner's guilt.  The state court summarizing the strength of

the case as follows:

> Griffin testified that he observed defendant shoot Young in the head
> at close range. Griffin's testimony about the details of the shooting
> corresponded with the medical examiner's findings regarding Young's
> wound and cause of death. Further, at least three witnesses, Sergeant
> Shelby, Detective Monte, and Seaberry, testified that Griffin told them
> defendant shot Young almost immediately after the shooting. Brandon
> testified that Griffin telephoned her and identified defendant as the shooter
> later that night. Griffin consistently repeated the same story about the
> shooting. Although Griffin was the only eye-witness to the shooting,
> Seaberry testified that defendant left her house minutes before the
> shooting, and Wilkins testified that immediately after the shooting, he saw
> defendant walk away from the driveway where the shooting occurred and
> then drive away. Defendant presented himself to the police a few hours
> after the shooting, and although he denied being at the scene of the
> shooting or changing his clothes, several witnesses confirmed that he had
> been at the scene and photograph evidence revealed that the clothes he
> was wearing close to the time of the shooting were different than those he
> wore to the police station.

Rupert, 2010 WL 2076983, at *5-7.

The test for harmless error in a federal habeas case is whether the error had "a

substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

Abrahamson, 507 U.S. 619, 637 (1993); Ruelas v. Wolfenbarger, 580 F.3d 403, 411

(6th Cir. 2009).  As stated by the Michigan Court of Appeals, the case presented against

Petitioner was extremely strong.  The prosecutor's elicitation of this irrelevant testimony

9

was not so pronounced and prejudicial that it can be said to have had a substantial and injurious influence in the outcome of his case given the substantial evidence of his guilt. The claim does not warrant habeas relief.

### 5. Evidence Tucker Smelled Marijuana at House Where Petitioner Resided

Tucker testified that he had been to the Holiday house–where Petitioner sometimes resided–on numerous occasions.  He denied knowledge that marijuana was grown there, and the prosecutor challenged this by asking, "even though you could smell it from the sidewalk?"  Trial counsel immediately objected.  The trial court sustained the objection was sustained and the prosecutor dropped the subject.  The Michigan Court of Appeals found that there was no basis in the record for this question but that any impropriety was cured by the sustained objection and by the fact that multiple other witnesses had testified that marijuana was grown at the house.  A fairminded jurist could easily agree with this analysis.  Thus, Petitioner is not entitled to relief on this ground.

### 6. Closing Argument

During closing argument, the prosecutor stated that gunshot contact wounds are rare in her experience, and this showed that Petitioner acted with premeditation and wanted to blow the victim's head off.  The prosecutor also said that only Petitioner knew the motive and the victim did not even know why he was killed.  The prosecutor then referenced a recent case involving two children beheading another child for no apparent reason as an example of a motiveless murder.  Trial counsel objected.  The trial court sustained the objection and directed the prosecutor to confine her argument to the present case.  During rebuttal argument, the prosecutor asked why the defense had not

10

produced Petitioner's father's gun for testing, as it was the prosecutor's theory that was probably the handgun used in the murder. Finally, in commenting on the presumption of innocence, the prosecutor stated that if she took the courtroom deputy's gun and killed him in front of the jury, at her trial the jury would be instructed that she was presumed to be innocent.

The court of appeals closely examined the challenged comments in the context of the case and the theories advanced by defense counsel. Rupert, 2010 WL 2076983, at *9-11. The court of appeals found that the prosecutor's comments during closing argument bordered on misconduct but were not sufficiently egregious in light of the evidence presented against Petitioner so as to require reversal. The Michigan Court of Appeals explained:

> For the reasons indicated, we agree with defendant that some of the prosecutor's questions and statements at trial were improper. We reiterate that the prosecutor committed misconduct by eliciting testimony from Stanton about defendant receiving payment for caring for his father and defendant's prior conviction. The prosecutor's questions were completely irrelevant and appear designed to improperly prejudice the jury against defendant. Further, there were several other occasions during the trial when the prosecutor risked inflaming the jury, and where her questions and comments arguably constituted misconduct. Such conduct is unacceptable and, in some cases, might warrant reversal.[3]
>
> *          *          *
>
> [3]As we have noted, the assistant prosecutor's conduct in this case can only be kindly categorized as overzealous. The misconduct did not result in a reversal in this case, but we strongly caution the prosecutor that such overzealousness in the future may result in a reversal and a miscarriage of justice.
>
> *          *          *
>
> Nonetheless, in this particular case, the properly admitted evidence establishing defendant's guilt was substantial, and the trial court gave the

11

> jury numerous curative instructions. Therefore, defendant cannot establish
> that the instances of misconduct in this case, even when considered
> together, were outcome determinative. Therefore, despite the prosecutor's
> misconduct, reversal is not warranted.

Rupert, 2010 WL 2076983, at *11 (citations omitted).

After careful review of the prosecutor's closing and rebuttal arguments, the Court agrees with the court of appeals that although the prosecutor's comments were at times improper they do not rise to the level required for prosecutorial misconduct. The Court also notes that the complained-of comments were isolated and occurred in the context of proper areas of argument.

The question on habeas review is whether a fairminded jurist could reject the claim in light of the clearly established Supreme Court standard. The state court viewed it as a close case, considered each instance carefully, and ultimately determined that reversal was not warranted. The court of appeals acted in a fairminded fashion – it applied the established standard to the record and made a reasoned decision. The Court finds that the decision state court's decision denying this claim did not amount to an objectively unreasonable application of the clearly established Supreme Court standard.

The Court also finds that the Michigan Court of Appeals reasonably rejected Petitioner's related ineffective assistance of counsel claim based on counsel's failure to object to the unpreserved allegations of prosecutorial misconduct.

Overall, Petitioner is not entitled to habeas relief based on the prosecutors comments in closing argument.

12

B.  Claim 2 - Exclusion of Impeachment Evidence

In his second claim, Petitioner contends that his right to present a defense and to confrontation were violated when the trial court limited his redirect examination of Anthony Tucker.  On redirect examination, Petitioner attempted to elicit testimony from Tucker that he made a statement to police that Griffin told him that Griffin had a problem with the victim because he owed him $1,500, and the victim kept beating Griffin up.  The trial court sustained the prosecutor's objection to the introduction of this portion of Tucker's statement to police on the grounds that it was unrelated to the subject matter introduced by the prosecutor on cross-examination and Griffin had previously admitted during his own testimony that the victim threatened him.

A criminal defendant has the right to present his or her own witnesses to establish a defense. This right is a fundamental element of the due process of law. Washington v. Texas, 388 U.S. 14, 19 (1967); see also Crane v. Kentucky, 476 U.S. 683, 690 (1986)("whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'")(internal citations omitted). However, an accused in a criminal case does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissible under the standard rules of evidence. Montana v. Egelhoff, 518 U.S. 37, 42 (1996). The Supreme Court indicated its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts." Crane, 476 U.S. at 689.

Similarly, the Confrontation Clause guarantees a criminal defendant the right to

13

confront the witnesses against him. Davis v. Alaska, 415 U.S. 308, 315 (1973).

"Cross-examination is the principal means by which the believability of a witness and

the truth of his testimony are tested. Subject always to the broad discretion of a trial

judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is

not only permitted to delve into the witness's story to test the witness's perceptions and

memory, but the cross-examiner has traditionally been allowed to impeach, i.e.,

discredit the witness." Id. at 314. The right of cross-examination, however, is not

absolute.

Supreme Court law gives trial court judges "wide latitude" to exclude evidence

that is repetitive, marginally relevant, or that poses a risk of harassment, prejudice, or

confusion of the issues. Id. (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679

(1986)).  As the Court of Appeals for the Sixth Circuit has recently explained:

> 'The key issue is whether the jury had enough information to assess the
> defense's theory of the case despite the limits on cross-examination.'
> United States v. Holden, 557 F.3d 698, 704 (6th Cir. 2009). 'So long as
> cross-examination elicits adequate information to allow a jury to assess a
> witness's credibility, motives, or possible bias, the Sixth Amendment is not
> compromised by a limitation on cross-examination.' United States v.
> Cueto, 151 F.3d 620, 638 (7th Cir. 1998); accord United States v. Fields,
> 763 F.3d 443, 464 (6th Cir. 2014).

United States v. Callahan, 801 F.3d 606, 2015 U.S. App. LEXIS 15931, 2015 WL

5202925, *12 (6th Cir. Sept. 8, 2015).

The Michigan Court of Appeals first addressed Petitioner's related state-law

evidentiary claims.  It held that the trial court did not err under Michigan Rule of

Evidence 106 (rule of completeness) because the prosecutor had only referenced the

absence of information in Tucker's police statement about observing bullets in Griffin's

14

house.  The court of appeals also found no error under Rule 613(b) (impeachment by use of prior inconsistent statement) because Griffin's trial testimony was not inconsistent with the statement Tucker heard him make.

Finally, the court of appeals  addressed and rejected Petitioner's constitutional claims as follows:

> Defendant devotes a large portion of his brief on appeal to arguing that he was denied his right to confront the witnesses against him and to present a defense. For the reasons indicted, the trial court did not abuse its discretion in restricting defense counsel's redirect examination of Tucker. Moreover, defendant was permitted to present evidence that Griffin bought cocaine from Young, always owed Young large sums of money, was repeatedly threatened by Young and had been scared of Young because of the threats, and had Young's gun at the time of the shooting. Defendant was not prevented from confronting the witnesses, presenting a defense, or denied his right to a fair trial.

Rupert, 2010 WL 2076983, at *12-13.

The Michigan Court of Appeals' decision does not constitute an unreasonable application of clearly established Supreme Court law. Griffin testified on cross-examination that he owed the victim $900.  He also admitted that he purchased crack cocaine from the victim, and he testified that they had a "falling out" over his cocaine use. Id., at 57-60.  Griffin admitted that the victim had been angry with him because Griffin owed him money, and he always said he was going to beat up Griffin.  Griffin told other people that the victim had threatened to beat him up.  This scared Griffin because the victim was a large man.  Griffin's cross-examination testimony could lead a fairminded jurist to conclude that the jury had enough information to assess his credibility, motive, or possible bias Griffin possessed despite the fact Tucker's statement to police regarding Griffin's statement was excluded.  Accordingly, it was not objectively

15

unreasonable for the Michigan Court of Appeals to reject Petitioner's second claim. Habeas relief is not warranted.

### C. Claim 3, Right to a Public Trial and Claim 4, Additional Allegations of Prosecutorial Misconduct

In Claim 3, Petitioner contends that he was deprived of his right to a public trial because the trial court excluded the public during voir dire and at other points during the trial. In Claim 4, Petitioner asserts additional allegations of prosecutorial misconduct, i.e. the introduction of his father's .38 caliber handgun and marijuana from a 2003 investigation. Respondent contends that these claims, which Petitioner raised for the first time in his amended petition, are barred by the one-year statute of limitations because his motion to stay proceedings and the amended petition were filed more than one year after Petitioner's conviction became final and the claims raised in the amended petition do not relate back to the claims raised by petitioner in his original habeas petition.[2] Respondent alternatively says that the claims lack merit.

### 1. Statute of Limitations

Petitioner had one year from the date on which the state court's judgment became final to file his habeas petition. See 28 U.S.C. § 2244(d)(1)(A). Petitioner's conviction became final on January 24, 2011—when the deadline for filing a petition for a writ of certiorari in the Supreme Court had passed. See Jimenez v. Quarterman, 555

---

[2]The Court made no determination that Petitioner's new claims would be timely when it granted the stay. Nor did it make a determination of timeliness when it lifted the stay. The fact that permission to file the amended petition was granted does not preclude Respondent from raising a limitations defense to the claims raised in the amended petition. See Quatrine v. Berghuis, No. 2:10–CV–11603; 2014 WL 793626, * 2-3 (E.D. Mich. February 27, 2014); Soule v. Palmer, No. 08–cv–13655; 2013 WL 450980, * 1-3 (E.D. Mich. February 5, 2013).

U.S. 113, 119 (2009).  Thus, Petitioner had until January 25, 2012, to file his federal

habeas petition.  He did so by filing it on January 19, 2012, just days before the

limitation period expired.   However, Petitioner did not file his motion to stay the habeas

proceedings until February 14, 2012, or move to amend his habeas petition until

September 29, 2014—after the limitations period expired.

     Where, as here, a petitioner files an original petition within the one-year deadline,

and later presents new claims in an amended petition that is filed after the deadline

passes, the new claims will relate back to the date of the original petition only if the new

claims share a "common core of operative facts" with the original petition.  <u>Mayle v.

Felix</u>, 545 U.S. 644, 664 (2005).  None of Petitioner's remaining claims that he raised

for the first time in his amended habeas petition share a "common core of operative

facts" with the claims raised in his timely filed original habeas petition.  Although

Petitioner alleged ineffective assistance of counsel and prosecutorial misconduct in the

original petition, the ineffective assistance of counsel and prosecutorial misconduct

claims that he raises in his amended habeas petition cannot relate back to the filing

date of his original habeas petition because these claims are based on wholly different

allegations which formed the ineffective assistance of counsel and prosecutorial

misconduct claims raised in the original habeas petition. See <u>Eller v. Bock</u>, 422 F. Supp.

2d 813, 818 (E.D. Mich. 2006).  Because none of Petitioner's remaining claims raised in

the amended petitions share a common core of operative facts with the claim raised in

the original petition, these claims are barred by the one-year limitations period. See

<u>Pinchon v. Myers</u>, 615 F. 3d 631, 643 (6th Cir. 2010).

     The statute of limitations "is subject to equitable tolling in appropriate

17

cases." Holland v. Florida, 560 U.S. 631, 645 (2010). A habeas "'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way'" and prevented the timely filing of the habeas petition. Id. at 649 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). The Sixth Circuit has observed that "the doctrine of equitable tolling is used sparingly by federal courts." See Robertson v. Simpson, 624 F. 3d 781, 784 (6th Cir. 2010). The burden is on the habeas petitioner to show that he or she is entitled to the equitable tolling of the one-year limitations period. Id.

Here, Petitioner is not entitled to equitable tolling because he has not argued or shown the circumstances of his case warrant tolling. Although Petitioner filed a lengthy reply brief, but he completely fails to address Respondent's statute of limitations argument.

The one-year statute of limitations may be equitably tolled based upon a credible showing of actual innocence under the standard enunciated in Schup v. Delo, 513 U.S. 298 (1995). McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013). The Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare[.]" Id. "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. (quoting Schlup, 513 U.S. at 329). Petitioner's case falls outside of the actual innocence tolling exception, because petitioner has presented no new, reliable evidence to establish that he was actually innocent of the crime charged. See Ross v. Berghuis, 417 F. 3d 552, 556 (6th Cir. 2005). Accordingly, review of Petitioner's remaining claims is barred by application of

18

the one-year statute of limitations.

### 2.  The Merits

Even assuming the claims were timely, they fail on the merits.  Each claim is addressed in turn below.

#### a.  Claim 3

Regarding Petitioner's claim as to his right to a public trial, The Sixth Amendment provides, in relevant part, that an accused in a criminal prosecution shall enjoy "the right to a . . . public trial."  U.S. Const. amend VI. The Sixth Amendment applies to the states via the Fourteenth Amendment.  In re Oliver, 333 U.S. 257, 272-73 (1948).  In 2010, the Supreme Court specifically held the Sixth Amendment right to a public trial included voir dire proceedings.  Presley v. Georgia, 558 U.S. 209, 213 (2010) (per curiam).  But a defendant's Sixth Amendment right to a public trial is limited. Circumstances exist that allow courtroom closure during any stage of a criminal proceeding, even over a defendant's objection:  [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure. Waller v. Georgia, 467 U.S. 39, 48 (1984).

Petitioner says that the trial court excluded the public from the courtroom during voir dire on the first day of trial.  He also contends, without citation to any point in the record, alleges that the public was possibly excluded during other portions of his trial. This claim was raised for the first time in his motion for relief from judgment.  The trial court denied relief, explaining in pertinent part: " . . . the courtroom was not closed, as

19

attorneys and members of the public entered an exited the courtroom at all times.

Moreover, defendant did not request the presence of anyone in the courtroom.  Under

these circumstances, the Court finds that defendant was not deprived of his right to a

public trial." (9/27/12 Wayne Cir. Ct. Op. at 3.).  The Michigan Court of Appeals denied

relief ""for lack of merit for the reasons articulated in the trial court's opinion." (11/4/13

Mich. Ct. App. No. 314931 Order.).

Petitioner cannot show a violation of his Sixth Amendment rights. First, the trial

court did not close the courtroom.  The trial court never said that those asked to step out

could not return.  The trial court merely asked those in the gallery to make room so the

prospective jurors could have room to come into the courtroom.  (1/26/09 Trial Tr. at

15.)  And after the first 14 jurors were "drafted" for voir dire, the trial court's comments

indicate that the gallery was still quite crowded with prospective jurors.  Id. at 22.

Further, after the jury was dismissed for the day, the prosecutor commented that some

prospective witnesses for the defense were sitting in the courtroom.  Id. at 152.  The

state courts properly denied his claim.

Further, Petitioner cites nothing in the record to support his assertion that the

courtroom was closed during other parts of the trial.  Conclusory allegations without

evidentiary support, do not provide a basis for habeas relief.  Cross v. Stovall, 238 F.

App'x 32, 39-40 (6th Cir. 2007).

### b.  Claim 4

Regarding Petitioner's claim alleging additional instances of prosecutorial

misconduct, he says that the prosecutor committed misconduct in introducing evidence

that during a 2003 execution of a search warrant for marijuana, the police found of

20

Petitioner's father with a .38 caliber firearm.  The prosecutor elicited testimony that the .38 caliber firearm was eventually returned to Petitioner's father and that Petitioner was not present during the marijuana search.  which was seized during a 2003 raid where police recovered marijuana at their home.

Although Petitioner first raised these claims in his motion for relief from judgment, the trial court denied them on the grounds that they had been raised before.  However, even under a de novo review, the prosecutor did not commit misconduct in introducing this evidence.  The evidence of the firearm was relevant to show that Petitioner had access to a .38 caliber firearm, the same caliber that killed the victim.  The prosecutor also took care to emphasize that Petitioner was not the subject of the marijuana search. Petitioner cites no Supreme Court case holding a due process violation where a prosecutor admits relevant and admissible evidence.  Habeas relief is not warranted on this claim.

## IV.  Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).

21

Here, jurists of reason would not debate the Court's conclusion that Petitioner has not met the standard for a certificate of appealability. The Court will also deny Petitioner permission to appeal in forma pauperis because any appeal would be frivolous.  28 U.S.C. § 1915(a)(3).

## V.  Conclusion

Accordingly, for the reasons stated above, the petition is DENIED.  A certificate of appealability is DENIED.

SO ORDERED.


<u>S/Avern Cohn</u>
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated: May 10, 2016
        Detroit, Michigan